Case number two is 21-27-24, United States v. Thomas Alt. And Mr. Rosen, yes? Yes, Your Honor. Thank you. May it please the Court, Mark Rosen appears on behalf of the defendant Thomas Alt. To begin with, as the Court is aware, we have four issues. To start out, when he first started the interrogation, Mr. Alt clearly invoked his right to have an attorney. What he said, unequivocally, is there an attorney available for me? That is a clear sign, based upon the relevant case law of this circuit, basically Weisinger and Lee, that that is akin to, can I have an attorney? Is there an attorney available? Can I call an attorney? There's no other reason for him to say, is there an attorney available? Unless he's saying, give me an attorney. Mr. Rosen, however favorably to Mr. Alt, we might interpret his question about whether a lawyer was available at the site of his interview. He shortly thereafter read aloud the consent form, was told he could stop the questioning at any time if he wanted to consult a lawyer. Why wasn't that enough to confirm that he knew he had a right to counsel, but choosing to proceed without one? Because that was once he invoked his right to counsel by saying, is there a lawyer available? All, everything had to have stopped. That's the law. It had to have stopped. They couldn't, that is what clearly the law says. You cannot, they have to just stop and move on and say, okay, you're done. They can't just clarify it. They can't just do any of that other sort of thing that they did. They can't, definitely cannot under the law do some subterfuge, which the agent did by saying, well, you know, you won't get one. There's not one here until you go to initial appearance. Basically telling, why don't you just talk to us? Because that's what we want to do. Mr. Rosen, was there a single fact to which your client admitted that was put in in trial through his statement alone? It was not established with other evidence. I believe, from my recollection, is that it was basically confirmatory. But I do understand where the court's coming from. But I also understand that the government during closing arguments relied upon that, relied heavily upon his statement during closing arguments. And most importantly, as in Weisinger, the jury relied upon his confession. They were out for a while. They asked, can we hear the confession, the interrogation? And for two hours, the judge played the interrogation for them, two full hours. And then two minutes later, they come back with their guilty verdict. And I think as in Weisinger, because Weisinger did say that the jury's reliance upon the confession was clearly a sign that this was not harmless error. Because it was – everybody relied upon it. It was basically done. And it was to a certain extent confirmatory. I know the court is aware of the facts and what happened. But that's what – that's where we go with it is the jury relied upon it. I think the jury materially relied upon it. The way I understood his defense is that his defense was sort of consistent with his statement. His defense – it wasn't a – it wasn't me defense at trial, right? No, it wasn't. So the defense was kind of consistent with here's what I told the FBI, and that's the truth. I didn't know that this guy was 15. But still the jury relied upon it. The jury relied upon him to convict him. You see what I mean as far as the harmless error analysis? I see. I see where you're coming from. It wasn't me defense. And then you put in this evidence where he admitted, well, it actually was me. That is – boy, that's pretty damning evidence. But here his defense seemed to be consistent with his statement. I can see where the court is coming from. But the thing is the jury relied upon it to convict him. How do you know that? Because I think when you look circumstantially, first of all, the government argued it during its closing arguments. Then you have, as I indicated, you have this deliberation. The jury says we want to hear his interrogation. They listened to it for two hours. Then two minutes later, they come back with a guilty verdict. So I think that that's kind of a whole circumstantial ball of wax to say they materially relied upon it as in Weisinger. I can see where the court is coming from. But I think when you look at that, you can't ignore the timeline of how the jury came to its verdicts in this case. And I know if the court wants to get in, I do have more issues. But whatever the court is willing to do, I – 15 minutes is – Let's go into Batson. Because jury number 68 did describe a significant negative experience with law enforcement that led him to plead guilty to a charge that in his account was a wrongful charge. That's correct. Why would that experience not be a legitimate race neutral reason for exercising that? Because – that's a good point, Your Honor. But because he indicated and asserted unequivocally – first of all, it was a 10-year-old case. It was a DUI. It had nothing to do with a case like this. He did say there was some issue there about that he wasn't the one who did it. But the fact of the matter, he did multiple times indicate he would not hold this against him. He understood this was a different situation. This was not something he would be able to try this case fairly on its facts and try it on the evidence before him. He would not hold that against him at all. And then the government says, well, we have unconscious bias. Did the government strike a white juror who was in a similar situation? I cannot recall that, Your Honor. I do know that this one was the only black juror. My client was black, and this one was struck for this. And the whole – as we remember, the challenge for cause was denied. The reason I say that is because here I think the government struck two jurors, one white, one black, and there was no juror. Usually Batson challenges, as you know, are successful when the juror says – when the government says we struck the black juror because she's a teacher.  That generally creates a Batson challenge. But here it's very difficult where they say, look, this juror has indicated there are these issues, and we're going to strike him for a peremptory challenge. And the judge finds the government's reason to be credible. And we don't really have anything upon which to reverse the district judge's credibility determination. Except that I think when you look at the fact that the – when you look at – first of all, there was no – as far as credibility is concerned, there was no issue of the credibility of Juror 68 with respect to his comments saying, I can try this on the case before me. I will not consider anything that happened in the past. This is a totally different set of facts. He did all that sort of language that all the government's cases that they did in their brief didn't have. He really covered himself, and he clarified that. And then the government talks about, well, unconscious bias. But it's fine. But the government, they just said, we don't believe him. That's what they said. I mean, that's what the government prosecutor said. He said all these things. He could be fair and unbiased. I just don't believe him. And the district judge said, fine, it's no problem. And it puts us in a very difficult position as to determining the government's credibility and overruling the judge on a credibility determination. And I think here the district judge probably would have been fine saying there's not even – you haven't even met step one. Except for the fact – We're not there. You don't have to address that because we're not there. He did, and the government provided a race-neutral reason. So that's what we look at. Right. And I'm just thinking that because of the law says you can't have a pretext for doing this sort of thing. My position is because of the way he – nobody challenged Jury 68's credibility in terms of his comments. I can be fair. But aren't they challenging the credibility by exercising a strike and saying he has shown bias against law enforcement? That is challenging his credibility. And our position is that it was pretextual. It was designed – How do you get around the judge's specific credibility finding that they were acting in good faith and it wasn't pretextual? It's our position it was erroneous, clearly erroneous. And what do you base that on? What are you asking us to base that on, especially given his answers and the fact, as the government pointed out, that in giving some of these answers there was hesitation in responding to the judge's questions? But hesitation means – Which is significant. He's thinking it through and coming up with an answer that he believes is credible. That's one version of it. It certainly is, Your Honor. I cannot discriminate or deal with that. I just think that this – when you look at it and the totality of him coming out saying a 10-year-old DUI conviction, him saying there was a totally different set of facts, that sort of thing, and then they're talking about this unconscious bias. I think that when you look at the totality of it, I think that it basically points – I think it was pretextual and I think the court clearly erred in making its determination. And I think if we can now get into, if the court's willing, to the third issue, the government instructing the jury on the definition of beyond a reasonable doubt. I think this is the same sort of situation. The government gave the jury parameters as to what they should do. You cannot be – not beyond a shadow, but not beyond all doubt. And in Glass, which this court said was basically a defense sort of thing, where the defendant basically argued sort of the other way. It's a bigger burden. The court of appeals shot that down. And that's clearly what happened here. And I think when you look at it also under – the government did talk about that. They did give the definition. And I know the court basically did a sort of a curative talk. But when you look at the case law that basically comes out of this case, citing the U.S. Supreme Court, Hollenberger, Phillips basically said the government, when they get up there and they talk, they have that aura of authority, that aura of impression, this aura of we are the might, the right. And that overcomes, as the court did in Vargas, any sort of curative instruction. And then you get into this thing where they're talking about – and the whole defense of my client was at trial was they haven't proven this case beyond a reasonable doubt, that sort of thing. Mr. Rosen, look, I think we can assume it was unwise for the prosecutor to start talking about what a reasonable doubt is and what a reasonable doubt is not. But it was an isolated remark, as you said just now. The judge reminded the jurors it was up to them to decide what a reasonable doubt was. The prosecutor moved on. I'm not – I'm having a difficult time imagining the precise form that was done. Well, I think when you look at the case law saying when the defense does it the other way around and sort of hedges and says, well, it's this, this, it's bigger than this, then all of a sudden that gets shut down and all of a sudden it gets lectured at. And also given the fact that like this court has done in Phillips and Vargas said that when the government says a definition, it carries a lot more weight because of their authority, their imprimatur, that sort of thing. But the court quickly issued the curative instruction saying I haven't instructed you on beyond a reasonable doubt. It's up to you to determine that. And I understand. Why didn't that cure any potential problem from the government's statements? Because Vargas is right on point on that. When the government does it, it's not enough because the government has that authority of we're the government, we are the government, and that's what the Vargas court said. I can't remember the exact language that was in that case. That was a 1978 case. We have since said that instructions from the court carry more weight with jurors than do arguments made by attorneys. And I understand. But there's still a court case law that says that the government, when they do talk, that carries a good deal of because of their authority of the government. I see, with all due respect, I have two minutes left if I may be allowed to reserve that for rebuttal. Of course. Thank you. Thank you. Ms. Boyle. Good morning, Your Honors. May it please the court and counsel, my name is Catherine Boyle on behalf of the United States. I'd like to turn immediately to the suppression issue that opposing counsel raised first. The district court here correctly denied Mr. Ault's motion to suppress statements because he did not unambiguously invoke his Fifth Amendment right to counsel. At the outset of the interview, he asked, should I have a lawyer? That's not an invocation. That's very clear based on this court's case law. And then afterwards, the agent spends a significant amount of time. I'm sorry, Your Honor, did you say something? Thank you. Afterwards, the agent spends a significant amount of time making sure that Mr. Ault understands English, going through his advice of rights. You know what, Ms. Boyle? You know what concerns me about this particular case? I'm with you on that, okay? I mean, I don't think he asked for a lawyer to start with that. But the thing here is the agents, this interview I think took place at the FBI building, and usually we see these types of situations, usually, when the agents are seeking some form of cooperation from the defendant as to others, not generally when they're just seeking evidence to, you know, shore up what is overwhelming evidence of the defendant's guilt. And sometimes the agents create their own problems, like this one here, where Mr. Ault is probably going to be convicted beyond any doubt without his statement, right? I mean, the government didn't even really need to use his statement because, as I indicated, I think his statement was consistent with the defendant's defense. I told the FBI the truth. I didn't know he was 15, and so I told the FBI, and that's what I told the jury. Everything is the same. But it sort of creates problems in these situations where the FBI does not interpret, particularly a second statement. The first one is just a question. The second one is, do you have a lawyer here? Is the second time he raises the lawyer issue. And, of course, they don't have one there, and the FBI agent properly tells him you're going to be assigned one or you'll be appointed one at the initial appearance. But that statement is even, like, that statement indicates to me that maybe the FBI agent even interpreted it as him asking for a lawyer. And it's this, does that make sense, what I'm saying? And it's a dangerous situation to be in because if it was a real close case and if he had said it a little bit differently or it wasn't recorded, then you have even maybe a problem that is of sort of the agency's own creation. Well, Your Honor, first of all, I agree, and I think that this was noted during my opposing counsel's argument, that in this case the information from Mr. Alts' interview was largely confirmatory of other evidence, as my co-counsel has admitted. In these cases, we frequently do see law enforcement agents attempting to conduct interviews, and I was not the district court prosecutor on this case, but I think one of the reasons is whenever there's devices, you see people saying, you know, it wasn't mine, it was my roommate's, you know, all these various things. And certainly the government believes the evidence was very strong in this case, so whether that defense would have been successful at trial is perhaps it wouldn't have been, but that doesn't mean that they don't want to question the defendant and, you know, get out in front of it. And the other thing is we do sometimes see cooperation in these types of sting cases and Project Safe Childhood, which are cases involving child pornography and all of that, because sometimes we end up having people agree to let law enforcement use their devices, which allows them to investigate potential other crimes. So I think there are reasons to conduct these interviews. And I think there are, too. I just didn't see it in this case. This case, it looked to me like the interview was just let's confirm your guilt. And that's it. We've got a gotcha, let's confirm your guilt. And he comes pretty close to asking for counsel. He comes pretty close. In my view, at least, he doesn't get there all the way, but at least the agent kind of believes that, too, when the agent says you'll be appointed one at the initial appearance. In other words, you're not going to get one now today here in the FBI building, but you'll get one when you go to court. Well, I think if you look at exactly what the agent said when he was reading the advice of rights and sort of what Mr. Ault was responding to, he says, you know, if you can't afford a lawyer, one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time. You know, Mr. Ault says, yep, and then the attorney, the FBI agent, continues explaining, so no matter what you say, if you decide that you want to have a lawyer, then we stop. So just any time. And when you look at what Mr. Ault says in response to that, it's very clear he is just asking a question about the process, and that question about the process is meant to inform him whether he's going to go ahead and talk right now, which is his choice. You know, he may be doing this because he thinks this is, I can talk myself out of trouble and I want to do it immediately. The agent's response did not seem to be the most responsive to his question at that point because the agent had just told him, if you can't afford a lawyer, one will be appointed for you before any questioning if you wish. And then he goes on, Mr. Ault asks about the appointed lawyer, do you have a lawyer here? And his response is ultimately, so that would be appointed at your initial appearance. Well, and I think that is specifically which- As opposed to right now, which is what he was talking about before. Yes. I think Mr. Ault's question, Mr. Ault seemed most interested in a lawyer who would be appointed rather than retained counsel, and it is likely that that appointed, I think the agent was just trying to be as truthful as he could be. You know, if you are going to be appointed counsel, that generally would happen at your initial appearance. I also think if we look at exactly what Mr. Ault said, it's important. He says, and real quick on the appointed lawyer, do you have a lawyer here? Real quick suggests to me that Mr. Ault was not intending to halt the interview. He was just trying to decide. He may have already decided to proceed with it. He might have said, if you had a lawyer here, please bring them over. If you don't, okay, I'm going ahead anyways. So I think when we look, this is really a process-based question, and the agent tries to give them a process-based answer, which is if you are looking for an appointed attorney, that is somebody that you would see at your initial appearance. And I really believe that the agent here was just trying to explain the process to Mr. Ault, and Mr. Ault seems satisfied with that answer and goes on. This is very similar in some ways to Lord v. Duckworth, where the individual says, I can't afford a lawyer, but is there any way I can get one? They're trying to figure out how and when they might have an attorney, and in that case, if they want to proceed answering the agent's questions or if they would instead prefer to wait until counsel was there. This court has talked a lot about action-oriented language, and I think it's also important to note Mr. Ault's question is not action-oriented here. It's really seeking information. And certainly, even if this court believes that there is more than one interpretation of what Mr. Ault said, this court has held previously that that alone shows that this was an ambiguous statement, if you can make an argument for either interpretation. So here Mr. Ault just made a choice to begin speaking right away rather than to wait for appointed counsel. Our alternative argument, of course, is that any error was harmless, given the overwhelming evidence against Mr. Ault. My opposing counsel has agreed that the interview information was essentially confirmatory of what was already in evidence, and that's particularly true here where we're not even particularly worried about identity, which sometimes is one of the issues in these cases, because you have Mr. Ault sending a picture of himself, and then that's the same person who shows up at the meat site after sending these explicit text messages with marijuana, a tablet, and an iPhone containing the grinder application. So really here, the information from the interview did not provide anything additional that was needed to convict Mr. Ault in this case. There was already sufficient evidence to sustain the conviction. My co-counsel— Why don't you go on to the Batson issue? Yes, Your Honor. Because it seems to me, well, black individuals do have disproportionate rate of negative experiences with law enforcement. If we allow that as a routine basis for striking such jurors, aren't we increasing the odds that a jury will not be representative of a defendant's community? Your Honor, I think that's a real concern. This court has discussed that issue in United States v. Brown, I think a 2016 case, and has said, however, that disparate impact—what you need for Batson is you need purposeful discrimination from the government, which is not something that occurred here. We are, of course, always concerned about disparate impact as well, but we're not even talking about, in this case, an individual who has potentially had certain negative experiences. With just law enforcement officers, this is an individual who also said that he had a negative experience, essentially, with the entire justice system, and to the degree that he said he pled guilty to something he didn't do. And I understand defense counsel said that this was 10 years ago, but this is something that was still so sensitive, the juror didn't even finish filling out the questionnaire on that point. And as the prosecutor noted and the district court observed, the juror expressed hesitation and shrugged when they were discussing whether they would be able to be fair. And this is a case where the government had four law enforcement witnesses, and it was important to the government to believe that it could get a fair shake. The district court clearly didn't err in finding that the government had produced a race-neutral reason, and this court has previously suggested that a bias against law enforcement does qualify as such a reason and has declined to overrule the district court, especially under the standard where the reason proffered has to be outlandish or you would want to see some other evidence that the government was engaging in purposeful discrimination. There's no reason for the court to decide that the government had intended to purposefully discriminate. They didn't. Do you want to go on to the reasonable doubt remark? Yes, Your Honor. Would it have been more prudent, do you think, for the court to have sustained the objection to the remark about reasonable doubt and instructed the jury to disregard it at the time? Your Honor, I believe it would have been the more cautious approach for the government not to say anything on reasonable doubt in this case. I do think, however, even if one were to view the remark as improper, it was very brief. It was just an isolated comment. It didn't really get to what reasonable doubt was. It just briefly said, you know, it's not this. The prosecutor immediately stopped speaking about it after the objection. The district court judge didn't sustain the objection but clearly instructed the jury, the meaning of reasonable doubt is up to you. So any potential prejudice from this very mild brief comment from the prosecutor, especially given the fact, as Judge Sainteve mentioned, that the jury gives more weight to what a trial court judge says, I just don't think that it presented a problem. And I think especially when we look at the remaining circumstances in this case, we have the trial court's instructions carrying any potential prejudice. The written instructions, the oral instructions all emphasize the burden without defining it. The court emphasizes that the burden is up to you. The defense mentioned during their closing it's up to you to define reasonable doubt. The prosecutor in rebuttal said reasonable doubt is the standard, made no attempt to define it. And we also, as we've discussed earlier in the context of the suppression motion, the evidence in this case was really overwhelming against the defendant. This is not a situation where a brief isolated comment on the part of the prosecutor made any difference to the outcome of this case. If your honors have no further questions on any of these issues or the supervised release issue, the government would ask that the court affirm and rest on the arguments in our brief. Thank you very much, Ms. Cordova. Thank you, your honors. Mr. Rosen asked for four minutes. He has two left. Give him the four, please. Thank you, your honor. Thank you, Judge Rovner. I don't believe I will need the four, but I appreciate the offer. I think when you talk about, and I know where the judge is coming from, when you say do you have a lawyer here, he said that, my client said that immediately asked after being Mirandized. And I think that is clearly where he's coming in, where they talk about you have a right to an attorney, you have a right to remain silent, you have a right to have an attorney before questioning. It all falls into that same package where you're talking about getting an attorney. And I think he asked, and I think based upon what the government cited, Lord v. Duckworth. I think Lord v. Duckworth did talk about this sort of language because Weisinger cited it, and Lee talked about the Lord v. Duckworth language. As can I have a lawyer, that sort of language is basically saying I want a lawyer, and that is unequivocal under that case law. And I know where the court is coming from about this sort of issue about harmless error, but once again, we're talking about the way the jury interpreted it and the way the jury utilized the interrogation and what the jury did to do it. And the jury, I think in this case, clearly found it to be dispositive in terms of finding my client guilty, I think based upon the timeline that I talked about during my argument. I think the government talks about, well, he would have talked anyway. I think that's all speculative. We don't know what he would have done. We don't know what he would have done. All I know is that immediately after being Mirandized, my client said, do you have a lawyer here? And then the agents started, well, no, we don't. You won't get one until later. Basically just shoving all that away and just having my client talk. So anything about that he would have talked anyway they think is speculative. As far as the Batson issue is concerned, I think as far as the bias is concerned, the words of Mr. Jay, the juror 68, contradict bias. I think that when you're looking at it, the bias that he might, juror 68, that the government says might have had against law enforcement was, as the government itself said during trial, was unconscious bias because juror 68 clearly said it's a totally different matter. I can decide this case on its own. And basically these are separate facts. This is 10 years old. It's a DUI. It's got nothing to do with this sort of case. And basically that's what happened about this. In the government's cases, they cited James and Hendricks and things like that. Never had that language by the juror where he basically clarified saying I can do this and I can judge this on my own. The government says that the government during closing arguments did not provide a definition of beyond a reasonable doubt. The government provided parameters of beyond a reasonable doubt. And I know that Judge St. Eve talked about how curative instruction now kind of solves that situation. But there's still the issue that the government has the imprimatur, the authority, the sort of appearance that they know more than everybody else in it because they are the government. We are the government. And I think that law has not been changed. And I think that that still should be recognized. Basically Glass, the defense started talking about parameters and that got shut down. The same thing happened here. The government provided parameters and it should have been shut down. And I think based upon individual reasons and cumulative for all the reasons, I think my client is entitled to the relief we seek, Your Honor, which is a new trial. Thank you very much. Mr. Rosen, where are you? I'm sorry. Everyone runs away. You don't have to be sorry. I apologize. No. Mr. Rosen, thank you so much. You too. You were appointed by the court and you certainly have given your all. Thank you. And we just appreciate it so much. Thank you. And Ms. Boyle, as always, we thank the government, but particularly today because of the very forthright way in which you responded to the questions. Thank you both for your service. It is really appreciated. Thank you. Thank you.